IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

DONALD H. MARQUES, JR., )
)
Plaintiff, )
)
v. )     Case No.
)     10-3057-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security, )
)
Defendant. )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Donald Marques seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Title II of the Social

Security Act ("the Act").  Plaintiff argues that (1) the ALJ failed to give proper weight to the

opinions of Dr. Farrow and Dr. Bhargava, (2) the ALJ improperly formulated plaintiff's residual

functional capacity, and (3) the ALJ improperly evaluated plaintiff's credibility.  I find that the

substantial evidence in the record as a whole supports the ALJ's decision that plaintiff is not

disabled.  Therefore, plaintiff's motion for summary judgment will be denied and the decision of

the Commissioner will be affirmed.

## I.     BACKGROUND

On August 5, 2005, plaintiff applied for disability benefits alleging that he had been

disabled since April 5, 2005.  Plaintiff's disability stems from compulsive disorder, depression

and panic attacks.  Plaintiff's application was denied on January 3, 2006.  On June 24, 2008, a

hearing was held before an Administrative Law Judge.  On July 21, 2008, the ALJ found that

plaintiff was not under a "disability" as defined in the Act.  On December 31, 2009, the Appeals

Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial-evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not

subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes =  go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Sandra Schneider, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1976 through 2008:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1976 | $ 3,649.18 | 1993 | $16,672.01 |
| 1977 | 2,767.21 | 1994 | 17,311.43 |
| 1978 | 5,936.95 | 1995 | 18,113.06 |
| 1979 | 8,379.95 | 1996 | 18,797.95 |
| 1980 | 6,233.16 | 1997 | 20,399.89 |
| 1981 | 6,068.63 | 1998 | 28,880.01 |

| | | | |
|------|-----------|------|-----------|
| 1982 | 17,929.91 | 1999 | 28,258.85 |
| 1983 | 21,514.62 | 2000 | 28,638.43 |
| 1984 | 14,023.37 | 2001 | 30,143.20 |
| 1985 | 26,078.79 | 2002 | 30,178.64 |
| 1986 | 28,859.04 | 2003 | 30,111.37 |
| 1987 | 25,295.29 | 2004 | 23,757.40 |
| 1988 | 10,010.18 | 2005 | 7,247.69 |
| 1989 | 2,457.31 | 2006 | 0.00 |
| 1990 | 13,524.87 | 2007 | 0.00 |
| 1991 | 16,434.62 | 2008 | 0.00 |
| 1992 | 17,311.43 | | |

(Tr. at 81).

**Disability Report - Field Office**

In a Disability Report completed on August 8, 2005, by Interviewer P. Davis Roberts of Disability Determinations, the Interviewer observed that plaintiff had difficulty understanding, concentrating, and answering (Tr. at 84-85). "The claimant cried many times during this interview, he came in to file an appeal but was outside his appeal time. He was in Fl, and is in the middle of what he says is a very messy divorce. He was accompanied by his friend, who is also his contact person. The claimant had a lot of problems staying on task, wanted to discuss every intimate detail of what his soon to be ex wife has done to him... He cried off and on through out [sic] the entire interview, which lasted 3+ hours. He was very hard to keep on track." (Tr. at 85).

**Function Report**

In a Function Report dated December 9, 2005, plaintiff said that his girl friend gives him his medicine and a drink, otherwise he will not take his medicine (Tr. at 96).

**B.    *SUMMARY OF MEDICAL RECORDS***

On April 7, 2003, plaintiff was seen at Access Healthcare for spitting up blood (Tr. at 200). He said he had relapsed and was abusing alcohol. Plaintiff was advised to stop drinking, and he was prescribed Lexapro.[1]

Nine days later, on April 16, 2003, plaintiff was seen by Azzam Muftah, M.D., a gastroenterologist, for colon polyps (Tr. at 194). Plaintiff denied alcohol use.

On September 16, 2003, plaintiff was seen by a nurse at Access Healthcare due to splitting up blood (Tr. at 126, 193). Plaintiff's exam was normal. Plaintiff was assessed with alcohol abuse, depression, hemoptysis [coughing up blood] and sinusitis. He was advised to attend Alcoholics Anonymous and to restart Lexapro.

On November 10, 2003, plaintiff was seen by Nancy Franklin, a certified physician's assistant, at Access Healthcare for cold symptoms (Tr. at 125, 192). Plaintiff's exam was normal except he had a hoarse voice. Ms. Franklin assessed alcohol use and advised plaintiff to go to Alcoholics Anonymous. She diagnosed depression and recommended that plaintiff restart Lexapro. In addition she assessed an upper respiratory infection for which he was prescribed an antibiotic.

---

[1]Treats anxiety and depression.

On March 4, 2004, plaintiff was seen at Access Healthcare (Tr. at 191). Plaintiff was reported (by himself or his wife) to be angry and obsessive/compulsive. His wife brought pictures of their home showing that it looked like a junk yard. Plaintiff had discontinued his Lexapro. He refused counseling.

On April 8, 2004, plaintiff was seen at Access Healthcare (Tr. at 190). Plaintiff reported that he was doing better on his medication and that there was some improvement on his obsessive personality. Plaintiff's exam was normal. He was assessed with obsessive compulsive disorder. He was told to increase his Zoloft [antidepressant] to 50 mg twice a day.

On April 19, 2004, plaintiff was seen by Riqueza Cua, M.D. (Tr. at 133, 139). The record indicates diagnoses, but no observations, tests, or examinations. Plaintiff was assessed with obsessive-compulsive disorder, bipolar II disorder, and problems related to his social environment. His GAF was 50.

On April 23, 2004, plaintiff was seen at Access Healthcare (Tr. at 189). He said he felt fine, but his wife reported that he was hyper. Either plaintiff or his wife reported that he had trouble sleeping. Plaintiff's physical exam was normal. He was assessed with obsessive compulsive disorder.

On May 26, 2004, plaintiff was seen by Dr. Cua (Tr. at 131, 137). He was seen with his family. He reported missing his Zoloft at times. He said he stopped taking Geodon because it made him feel funny. He reported still exhibiting obsessive compulsive disorder behaviors. His mood was "less anxious." He was assessed with obsessive-compulsive disorder, bipolar II disorder depressed moderate with atypical features with rapid cycling, attention-

deficit/hyperactivity disorder, and problems related to his social environment. His GAF was 55[2]. He was told to continue Zoloft and return in two to three months.

On August 27, 2004, plaintiff was seen by Dr. Cua (Tr. at 130, 136). Plaintiff's wife accompanied him. They reported that plaintiff was on vacation, that he gets easily distracted, that he "buys a lot of stuff," was going to auctions, had 21 cars, had "loads of furniture," and was compulsive. Dr. Cua observed that plaintiff's mood was pleasant, he was joking around, he "wants to find a nice girl," he thought his wife was not helping out. He was assessed with obsessive-compulsive disorder, bipolar II disorder depressed moderate with atypical features with rapid cycling, and problems related to his social environment. His GAF was 55. He was started on Strattera and told to return in one month.

On October 1, 2004, plaintiff was seen by Dr. Cua (Tr. at 129, 135). Plaintiff's wife had called and reported that plaintiff was on a buying spree out of state. Plaintiff told Dr. Cua that he had been fixing a house in Kansas. He admitted that he had not taken his medication, he was anxious and depressed because his wife had served him with divorce papers, that he was stressed at work, that although he was doing a good job a supervisor was pressuring him, and that he was unable to function. He was anxious and tearful. His speech was logical and coherent; he had fair insight and judgment. He was assessed with obsessive-compulsive disorder, bipolar II disorder depressed moderate with atypical features with rapid cycling, attention-

---

[2]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

deficit/hyperactivity disorder, and problems related to his social environment. His GAF was 50.[3]

Dr. Cua referred plaintiff for therapy and told him to return in a week and to consider taking a

mood stabilizer.

April 5, 2005, is plaintiff's alleged onset date.

On August 2, 2005, plaintiff was seen by Jeff Farrow, Ph.D., a clinical psychologist, for

individual psychotherapy (Tr. at 248). Plaintiff was on time, was casually dressed and

adequately groomed. His mood was mildly depressed. Plaintiff reported decreased sleep, racing

and ruminating thoughts, increased irritability, and feeling helpless, restless, and hopeless. His

GAF was 51-53.

On September 21, 2005, plaintiff was evaluated by Dr. Farrow (Tr. at 151-154, 244-247).

**Informants**: The information for this initial clinical assessment was provided by Mr.
Marques. Mr. Marques appears to be a reliable informant. The information given for
this initial clinical assessment appeared to be valid.

**Chief Complaint**: When asked why he was seeking services Mr. Marques stated, "I
have depression, anxiety, Obsessive Compulsive Disorder and Bipolar. I think about the
past a lot. These problems have been getting worse in the past month or so."

**History of Present Illness**: According to Mr. Marques, "I worked in prisons for 20
years, most of my life and I don't have anything to show for myself. I used to have lots
of stuff when I lived in Florida. I had lots of cars and lots of other stuff. I used to like to
go to yard sales and get stuff. Now I don't get any work. My wife is selling everything.
She sold my 1978 Camaro for like $1,400. I think she is just giving this stuff away. The
stuff she is not giving away, she has had yard sales. It would either sale [sic] or she just
throws it away. It is very upsetting to me that I didn't get to bring all my stuff with me
when I left Florida. I am at the point where I just don't care anymore. I am not sleeping
at night. I have lots of dreams. I can't see my kids anymore. I have no self-esteem. The
girlfriend I have here is not as understanding as I would like her to be. She doesn't seem

---

[3]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal
ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social,
occupational, or school functioning (e.g., no friends, unable to keep a job).

to understand my problems either. I used to be on some medicine but it was so old that I threw it out. I would like to talk to somebody about getting on some medicine."

**Past Psychiatric History**: Mr. Marques states he was treated on an outpatient basis while residing in Florida. He did not remember the name of the clinic. He denied any other psychiatric history on an inpatient or outpatient basis. He also denied any previous drug or alcohol treatment either on an inpatient or outpatient basis.

**Medical History**: . . . His current medical problems include allergies, frequent headaches and intermittent migraines. He states he has no family physician and is not currently taking any prescription medications. . . . Mr. Marques states his last physical examination was "a long time ago". . . . Mr. Marques states he is not currently experiencing any type of pain and feels that his medical needs are being met at this time. "I'm not sick."

\* \* \* \* \*

**Addictive Behavior/Dependence**: Mr. Marques stated he had his first alcoholic drink around the age of 18. He drank on a heavy basis until the age of 26. "Now I just drink on very rare occasions. The last time was probably a month ago. I pretty much quit when I got married." Mr. Marques reported using marijuana while in high school. He denied any other types of addictive behavior.

**Psychosocial History**: . . . Mr. Marques appeared to be more than capable of attending to his activities of daily living. . . . Mr. Marques reports being broke. . . . He states he has been unemployed for the past couple of years.

The form notes that a mental status examination was performed and says, "See attached

Mental Status Examination sheet"; however, there is no Mental Status Examination sheet

attached to this report. Dr. Farrow diagnosed the following:

| | |
|---|---|
| Axis I: | Bipolar I Disorder, Most Recent Episode Mixed to Moderate Obsessive Compulsive Disorder |
| Axis II: | Diagnosis deferred. |
| Axis III: | Allergies, frequent headaches, and intermittent migraines, all by client's report |
| Axis IV: | Limited support system, unemployed, financial stress. |

Axis V: GAF current 50-60.[4] Past year 60-70.[5]

* * * * *

**Formulation and Recommendations:**

Rationale for Diagnosis - Mr. Marques meets the diagnostic criteria for Bipolar I Disorder, Most Recent Episode Mixed to Moderate. Mr. Marques reports a history of experiencing both manic and depressive episodes. His manic episodes were described as distinct periods of persistently elevated, expansive or irritable mood. During this period of mood disturbance he has gone up to one week with only sleeping three or four hours a night. He experiences mood swings, flight of ideas, is easily distracted, has increased irritability, an increase in goal-directed behavior and pressured speech. He also reports experiencing depressive episodes during which he has depressed mood, decreased sleep, up and down appetite, decreased energy, intermittent crying spells, being easily distracted, experiencing racing and ruminating thoughts, having increased irritability "at times" and experiencing moderate experiences of anhedonia.[6] Mr. Marques's obsessive compulsive symptoms include having recurrent persistent thoughts and impulses. These thoughts and impulses are not particularly excessive. He worries about real life problems. Mr. Marques attempts to ignore or suppress his thoughts. He recognizes that the obsessive thoughts are produced by his own mind. His repetitive behaviors include collecting "things" at yard sales, out of ditches, and estate sales. This behavior is aimed at preventing or reducing distress caused by the thought process.

Client's Strengths - Mr. Marques has good verbal skills and appears to be of average intelligence, although formalized intelligence testing was not conducted.

* * * * *

---

[4] A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[5] A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

[6] Anhedonia is the technical term for the inability to experience joy.

<u>Treatment Recommendations/initial Treatment Plan</u> - Mr. Marques will participate in individual psychotherapy to work on issues surrounding his Bipolar Disorder and Obsessive Compulsive Disorder. He will work on decreasing his depressive and anxiety symptoms while increasing his coping skills, problem solving skills, and decision making skills.

On October 19, 2005, plaintiff saw Elizabeth Bhargava, M.D., a psychiatrist (Tr. at 155-156, 242-243).

**Identifying Information**: The patient is a 46-year-old married but separated, unemployed, Caucasian male who lives in Willow Springs with his girlfriend.

**Presenting Complaint**: "Dr. Farrow thinks I need medications."

**History of Present Illness**: The patient was evaluated by Dr. Farrow on 09/21/05. . . . He states that he was diagnosed with Bipolar Disorder by Dr. [Cua] in Florida. He used to be treated with medication, which included Strattera, Zoloft, and Restoril. He has not been on medications for a couple of years. He reports not being able to sleep. He goes to sleep at times between 2:00 a.m. and 4:00 a.m. He has been depressed. One of his stressors include his relationship with his ex-wife, who apparently was unfaithful to him, and had him kicked out of the house on a restraining order, went to court and lied about him, and got his 13 cars as well as his house and left him with nothing. Apparently, she alleged that he was abusive. The patient is accompanied by his girlfriend, Cathy. He, himself, is a rather poor historian due to him being very circumstantial. He tells me he starts projects in the middle of the night, such as tearing down a wall of the house, repairing things, and usually does not complete the project and jumps onto a new one. He tends to dwell in the past, and there have been times when he bursts out crying. He does acknowledge passive suicidal ideation at times. He used to enjoy working on cars, but has not been doing so lately. He denies any auditory or visual hallucinations. He does acknowledge some mild paranoia. He does have some mild memory problems. He tends to be disorganized. He does have obsessive compulsive symptoms, his hoarding. She tells me he cannot bear throwing things away. He goes into dumpsters to pull out stuff and restore them. They have a lot of garbage that they do not need. Although there is some baseline disorganization, he does have bursts of energy with decreased need for sleep and increased goal-directed activities.

**Past Psychiatric History**: It seems that apparently he has not been very compliant with medications. There have been no prior hospitalizations or suicide attempts. . . .

**Substance Abuse History**: He reports an eight to ten year period of drinking heavily, up to a six pack a night on a daily basis. However, he quit that, and currently drinks an occasional beer. He quit smoking. . . .

**Multiaxial Psychiatric Diagnosis**:
**Axis I:**     Biplar Disorder, current episode mixed
                Rule out Attention Deficit Hyperactivity Disorder
                Rule out Obsessive Compulsive Disorder
**Axis II:**    Deferred
**Axis III:**   Arthritis; migraines
**Axis IV:**    Unemployed; Issues with ex-wife.
**Axis V:**     Global Assessment of Functioning of 44.[7]

On November 9, 2005, plaintiff saw Dr. Farrow for individual psychotherapy (Tr. at 241). Plaintiff was on time, was casually dressed and adequately groomed. His mood was normal. Plaintiff reported disrupted sleep, mild racing and ruminating thoughts, increased frustration level and feeling helpless. "Focal issue for today's session was setting boundaries in interpersonal relationships." Plaintiff's GAF was 51-53.

On November 16, 2005, plaintiff was evaluated by Dr. Farrow in connection with his disability application (Tr. at 147-150).

GENERAL OBSERVATIONS: Mr. Marques . . . presented on time for the scheduled appointment and stated he drove himself to this appointment. Mr. Marques was casually groomed. He was neat and clean in appearance. His mood was mildly anxious and depressed and his affect was appropriate to content. He was alert and oriented. His speech was logical and goal-directed. His eye contact was good. His affective expression as observed during today interview would be described as mildly depressed and mildly anxious.

* * * * *

---

[7] A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

PRESENT ILLNESS:  . . .  When asked about his history and current symptoms Mr. Marques stated, "I haven't been working.  I worked in prisons both in New York and Florida for most of my life, at least twenty years of it.  I've been diagnosed with bipolar and obsessive compulsions.  I used to collect things.  I guess I still do, but my girlfriend is helping me with that.  I used to get stuff from yard sales.  My garage and porch got full.  I had 21 cars.  I guess my ex-wife is selling them now.  That really bothers me.  I spent a lot of time and money getting that stuff and now she has it.  We're getting divorced after twenty years of being together.  I've gotten to where I didn't care about anything.  I don't have nothing to show for my life.  My ex-wife has it all.  I'm not sleeping at night.  I'm only sleeping three or four hours per day.  I have two kids and I can't see either one of them.  My self-esteem is gone.  My present girlfriend isn't as understanding as I'd like her to be.  She's a good person and has been helping me, but there are things I feel I just have to have.  I'm back on some medicine now.  I hadn't been on any medicine in over a year. I'm taking Zoloft and Seroquel.  I guess they're working."

Mr. Marques meets the diagnostic criteria for Bipolar I Disorder,[8] most recent episode mixed, moderate.  Mr. Marques reported experiencing both manic and depressive episodes. His manic episodes were described as being distinct periods of persistently elevated, expansive, or irritable mood during which he has gone up to one week with only sleeping three or four hours per night.  He experiences mood swings, flight ideas, is easily distracted, has increased irritability, pressured speech and an increase in goal-directed behavior.  Mr. Marques reported he is currently in a depressive episode.  His depressive episodes include depressed mood, decreased sleep, up and down appetite, decreased energy, crying spells "most of the time," being easily distracted, experiencing racing and ruminating thoughts, increased irritability "at times," and moderate symptoms of anhedonia.  He also reported feeling helpless "at times," feeling hopeless, feeling restless and worthless.  Mr. Marques also meets the diagnostic criteria for Obsessive Compulsive Disorder.  He reported experiencing both obsessive thoughts and compulsive behavior.  His obsessive thoughts were defined as being recurrent and persistent thoughts, impulses or images that are experienced sometime during the day.  These are intrusive and inappropriate.  They cause marked anxiety and distress.  The thoughts and impulses are not simply excessive worries about real life problems.  Mr. Castillo [sic] reported he tries to suppress and ignore these thoughts or images.  He reported experiencing repetitive behavior in the form of mental acts or compulsions he does counting with his fingers, tapping, etc.  These types of behavior and mental acts are aimed at preventing or reducing distress or preventing some dreaded event/situation from

---

[8]Bipolar I Disorder, Most Recent Episode Mixed, means that the patient's most recent episode is of mixed mania and depression.  The patient has had at least one Major Depressive, Manic or Mixed Episode.

happening.  Mr. Castillo [sic] reported he recognizes the obsessions and compulsions are excessive and unreasonable, but he cannot control them.  When the obsession and compulsions are present they cause marked distress and are excessively time consuming.  This has caused him to have significant interference in his daily routine including occupational functioning and social activities.  At the time of this evaluation, Mr. Marques denied any current or previous auditory or visual hallucinations and no delusional thought processes were noted.  He denied having any unexpected panic attacks.  During this evaluation, Mr. Marques' mood was mildly depressed and mildly anxious.  His affect was appropriate to content.  His insight appeared to be poor and his judgment appeared to be fair.  He denied any current suicidal or homicidal ideation, plans or intent.

PAST HISTORY OF MENTAL DISORDERS:  When asked about previous psychiatric treatment Mr. Marques reported he is currently receiving treatment at Ozarks Medical Center Behavioral Healthcare.  In the past, he was treated on an outpatient basis in Florida. He denied any other history of either inpatient or outpatient psychiatric treatment.  He also denied any previous drug or alcohol treatment.

* * * * *

When asked about his own alcohol and illicit substance use history Mr. Marques reported he had his first alcoholic drink around the age of 18. He reported he drank on a heavy basis until the age of 26, "When I got married."  He reported only drinking on rare occasions now.  The last time was approximately one month ago.  When asked about illicit substance use, Mr. Marques reported he used marijuana "when I was in high school."  Mr. Marques denied any current legal difficulties.

INTELLECTUAL FUNCTIONING AND SENSORIUM: . . .  Memory for immediate information was rated as poor in that Mr. Marques was able to repeat five digits forward and only two digits backward.  He evidenced intact remote memory functioning in that he could relate the events of his life in a logical, coherent and consistent fashion.  Mr. Marques' functional memory would be rated as fair.

* * * * *

DIAGNOSIS:  The following diagnostic impressions are based on Mr. Marques' clinical presentation as well as his reported history and symptoms.

Axis I  296.89 Bipolar I Disorder, most recent episode mixed, moderate.
                303.3   Obsessive Compulsive Disorder.
Axis II                           Diagnosis deferred.
Axis III                          Allergies. Frequent headaches.  Intermittent migraines. (all
                                  per client's report)

|            |     |                                                    |
|------------|-----|----------------------------------------------------|
| Axis IV    |     | Limited support system. Unemployed. Financial stress. |
| Axis V     | GAF | Current 50-60, past year 60-70.[9]                 |

* * * * *

A.  <u>Understand and remember instructions</u>.  Mr. Marques did not demonstrate any difficulties in his ability to understand and remember simple instructions, moderately complex level instructions, or complex level instructions.  If Mr. Marques' Bipolar I Disorder and his OCD symptoms are exacerbated, it is believed he would have difficulties remembering complex level instructions.

B.  <u>Sustain concentration and persistence in tasks</u>.  Mr. Marques was able to sustain concentration and persistence on simple tasks, moderately complex level tasks, and complex level tasks during this evaluation. Again, it is felt if his bi-polar or OCD symptoms are exacerbated, he will have difficulties with his ability to concentrate on complex level tasks.

C.  <u>Interact socially and adapt to his environment</u>.  Mr. Marques' ability to consistently appropriately interact with others (i.e., the general public, co-workers, or work supervisors) and adapt to changes in his environment in a safe manner would be greatly enhanced if in an environment with limited contact with the public and few inherent hazards.

On November 28, 2005, plaintiff saw Dr. Bhargava (Tr. at 157, 240).  "The patient tells me he is doing better with taking the Seroquel;[10] however, he has cut down from the 200 mg because he was running out of his medications and has been taking only 100 mg at bedtime.  He does acknowledge a couple of episodes where he does get more depressed and preoccupied with all of his losses much easier.  He is sleeping better.  He is significantly less circumstantial this interview.  He is accompanied to this visit by his girlfriend, who tells me that he is doing better

---

[9]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) <u>or</u> some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

[10]Antipsychotic.

16

in terms of his mood swings as well as his sleep."  Dr. Bhargava observed that plaintiff was

casually dressed, his mood was less depressed, his thought process was coherent.  She assessed

him with "significant improvement."

On December 8, 2005, plaintiff saw Dr. Farrow for individual psychotherapy (Tr. at 239).

Plaintiff was on time, casually dressed and adequately groomed.  Plaintiff reported up-and-down

sleep pattern, mild racing and ruminating thoughts, and feeling helpless.  "Focal issue for today's

session was coping with the holidays and being medication complaint."  Plaintiff's GAF was 54-

57.

On December 8, 2005, Dr. Farrow wrote a letter to whom it may concern:

This letter is being written on a request, from Donald Marques, regarding information
about his current level of emotional/mental functioning.

Mr. Marques has been a client here at Ozarks Medical Center Behavioral Healthcare,
since 09-21-2005.  At the time of admission, Mr. Marques' symptoms met the diagnostic
criteria for Bipolar I Disorder, most recent episode, mixed, moderate and Obsessive
Compulsive Disorder.  Mr. Marques is participating in both medication services and
individual psychotherapy.  Mr. Marques' response to antidepressant medications has
been reported to be in a positive direction.

At the time of his last appointment, on 12-08-2005, Mr. Marques was continuing to
report experiencing the following depressive symptoms:  depressed mood, decreased
sleep, "but it is more on the medication," decreased energy, experiencing racing thoughts,
increased irritability "at times," is easily distracted, having difficulties with his
concentration and memory, and symptoms of anhedonia.  Mr. Marques also continues to
experience obsessive thoughts, "but my compulsion to collect junk has gone down on my
medication."  Mr. Marques' current mental health symptoms will affect his ability to be
gainfully employed for at least the next twelve mouths, if not longer.

(Tr. at 159, 160).

On January 3, 2006, Kenneth Burstin, Ph.D., completed a Psychiatric Review Technique

(Tr. at 165-178).  He found that plaintiff suffers from bipolar disorder.  He noted that plaintiff

has a diagnosis of obsessive compulsive disorder which is "not fully supported by objective findings." He determined that plaintiff suffers from mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and has had no episodes of decompensation. Dr. Burstin noted that Dr. Farrow's opinion that plaintiff could not work for at least twelve months was subjective and based on only a few visits and that the notes indicated plaintiff had improved with treatment. Dr. Burstin also noted that plaintiff alleged panic attacks but had not complained of panic attacks to his doctors.

That same day, Dr. Burstin completed a Mental Residual Functional Capacity Assessment (Tr. at 179-182). He found that plaintiff was moderately limited in his ability to interact appropriately with the general public but that he was not significantly limited in any other area. "Claimant retains the capacity to acquire, retain, perform and sustain complex tasks. Claimant can interact in environments that do not require frequent public contact. Claimant can adapt to changes in routine work environments."

On January 6, 2006, plaintiff saw Dr. Farrow for individual psychotherapy (Tr. at 238). Plaintiff was on time, casually dressed and adequately groomed. Plaintiff reported an up-and-down sleep pattern, mild racing and ruminating thoughts, and feeling helpless. Plaintiff was assessed with a GAF of 54-57.

On January 17, 2006, plaintiff's girl friend accompanied him to his appointment with Dr. Bhargava (Tr. at 237). They both reported that plaintiff gets irritable over "silly things. There have been no real anger episodes. He has been sleeping well. His mood is fairly good." He was assessed with, "Mild symptoms." She continued his Zoloft and increased his Seroquel to 250 mg

18

at bedtime "to help with the irritability and circumstantiality. He is also complaining of being distractible."

On January 30, 2006, plaintiff saw Dr. Bhargava (Tr. at 236). Plaintiff reported continuing to get irritable off and on. He was sleeping well. "He talked to me about how well he cooks. He does get upset at his girlfriend for not being able to do as much over the last one month, but apparently she had an accident in which she hit her head, which may have contributed to this. I asked him to be patient." Plaintiff complained about his upcoming divorce and about not wanting to participate in mediation. Dr. Bhargava observed that plaintiff was mildly depressed, his thought process was coherent, he was not suicidal or psychotic. She increased his Seroquel to 25 mg every morning and 250 mg at bedtime and continued his Zoloft.

On February 13, 2006, plaintiff saw Dr. Farrow for individual psychotherapy (Tr. at 234-235). Plaintiff was on time, he was casually dressed and adequately groomed. Plaintiff reported racing thoughts, memory difficulties, being mildly withdrawn. "Focal issue for today's session was dealing with financial stressors and medication compliance." Plaintiff was assessed with a GAF of 54-57.

On March 9, 2006, plaintiff saw Dr. Bhargava (Tr. at 232). "Mr. Marques reports that he and his girlfriend sent a letter to the attorney in Florida stating that they would not be able to go for court because they could not afford it. He has been quite upset over the fact that he has no contacts with his daughter and son. He tells me his ex-wife put his 13-year-old daughter out into foster care with the state. Both he and his girlfriend are hoping to be able to track her down and have her come to stay with them. His girlfriend tells me that Seroquel is making him tired, especially when taken in the morning. It does help him with sleeping at night, but sometimes

makes him oversedated." Dr. Bhargava decreased plaintiff's Seroquel to 100 mg at bedtime and started Abilify.[11] She suggested he contact the Division of Family Services in Florida as well as his attorney.

On March 17, 2006, plaintiff saw Dr. Farrow for individual psychotherapy (Tr. at 230). Plaintiff was on time, he was casually dressed and adequately groomed. Plaintiff reported nervousness, racing thoughts, memory difficulties. "Focal issue for today's session was dealing with divorce, division of property, [and] legal problems." Plaintiff was assessed with a GAF of 54-57.

On March 22, 2006, plaintiff was seen at Access Healthcare for a "consult" (Tr. at 124, 188). Plaintiff's "wife" stated that he had obsessive-compulsive disorder. She reported radical changes in his behavior, said he collects junk constantly and gets upset at the drop of a hat. A physical exam was performed which was normal. Plaintiff was diagnosed with obsessive-compulsive disorder and personality disorder. He was started on Zoloft and referred to a psychiatrist.

On April 4, 2006, plaintiff saw Dr. Farrow for individual psychotherapy (Tr. at 228). Plaintiff was late. He was casually dressed and adequately groomed. Symptoms reported included mildly expansive mood, racing thoughts, mild pressured speech, and increased frustration. "Focal issue for today's session was coping with on-going legal problems." Plaintiff was assessed with a GAF of 54-57.

---

[11]Treats bipolar disorder.

On April 20, 2006, plaintiff saw Dr. Bhargava (Tr. at 226). "Mr. Marques states he does get irritable, otherwise he rates his depression as a three of ten. He comes in with his girlfriend and they both complain about each other. However, their issues and reactions that they describe do not appear to be more than what one would expect in a co-habitating couple. I helped them understand that the medications are not going to take away all their problems." Plaintiff's mood was "fairly good," his affect was reactive and appropriate, his thought process was coherent, and his speech was normal in rate and volume. Under assessment, Dr. Bhargava wrote, "Doing better." His GAF was assessed at 55. Dr. Bhargava continued plaintiff's Zoloft, increased his Abilify to 15 mg and discontinued Seroquel.

On May 4, 2006, plaintiff saw Dr. Farrow for individual psychotherapy (Tr. at 224-225). Plaintiff was on time for his appointment, was casually dressed and adequately groomed. The focus of the session was processing how to let go of the past in order to move forward. On a scale of zero to ten with zero being no measurable progress, five being goal partially met, and ten being goal achieved, Dr. Farrow ranked plaintiff a six. His GAF was 54-57. Plaintiff was advised to return in four to six weeks for supportive therapy.

On May 19, 2006, plaintiff was seen by Dr. Bhargava (Tr. at 223). "Mr. Marques says he is doing fairly well. He has been stressed because he will have to go to Florida for the court hearing regarding division of property related to the divorce. He is anxious about that. . . . He has been sleeping fairly well. Occasionally he doe[s] get irritable but nothing out of the way." Dr. Bhargava observed that plaintiff's mood was fair, his affect was reactive and appropriate. She concluded, "Fairly stable in spite of stressors" and assessed a GAF of 60. He was continued on his same medications and was encouraged to diet and exercise.

On June 7, 2006, plaintiff saw Dr. Farrow for individual psychotherapy (Tr. at 221-222). Plaintiff was on time for his appointment and was adequately groomed. Plaintiff reported mild racing thoughts, mild pressured speech, ruminating thoughts. The focus of the session was making decisions related to his divorce proceedings. On a scale of zero to ten with zero being no measurable progress, five being goal partially met, and ten being goal achieved, Dr. Farrow ranked plaintiff a six. His GAF was 56-58. Plaintiff was advised to return in four to six weeks for supportive therapy.

On June 16, 2006, plaintiff saw Dr. Bhargava (Tr. at 219). Plaintiff said he was anxious about having to go to Florida the next month but "otherwise he has been doing fairly well." He had had no significant episodes of irritability. "His girlfriend tells me he keeps himself really busy." He had not yet signed up for the Solutions to Wellness program. Plaintiff's thought process was coherent. His mood was mildly anxious. He was assessed as "fairly stable" with a GAF of 60. He was told to continue on his same medications and return in four to six weeks.

On July 5, 2006, plaintiff was seen by Dr. Farrow for individual psychotherapy (Tr. at 217-218). Plaintiff reported increased appetite, decreased energy, ruminating and obsessive thoughts. Dr. Farrow and plaintiff worked on decreasing anxiety symptoms while increasing mood stabilization, coping with increased anxiety and weight gain. On a scale of zero to ten with zero being no measurable progress, five being goal partially met, and ten being goal achieved, Dr. Farrow ranked plaintiff a six. His GAF was 53-55. Plaintiff was advised to return in four to six weeks for supportive therapy.

On July 21, 2006, plaintiff saw Dr. Bhargava (Tr. at 215). "Mr. Marques says he did not have to go to Florida after all. The attorney settled the whole matter over the phone. He is going

to get about $46,000.  He does get depressed occasionally thinking about his children.  He continues to gain weight.  It does not appear that he has been working on his diet or exercise.  He complains that it is to [sic] hot."  Plaintiff was casually groomed, his mood was "fairly good," affect was "bright."  His thought process was coherent.

"Assessment:

1.  Continues to be fairly stable.

2.  Global Assessment of Functioning Score of 64."

Dr. Bhargava recommended plaintiff continue with 100 mg of Zoloft daily, 156 mg. of Abilify every morning, 20 mg of Levitra as needed, and return in six to eight weeks.

On August 2, 2006, plaintiff saw Dr. Farrow for individual psychotherapy (Tr. at 213-214).  Plaintiff was on time and was adequately groomed.  Plaintiff reported decreased sleep, increased energy, ruminating and obsessive thoughts.  "Focal issue for today's session was coping with financial problems and finalizing a divorce."  Dr. Farrow and plaintiff worked on decreasing anxiety symptoms while increasing mood stabilization.  On a scale of zero to ten with zero being no measurable progress, five being goal partially met, and ten being goal achieved, Dr. Farrow ranked plaintiff a six.  His GAF was 53-55.  Plaintiff was advised to return in four to six weeks for supportive therapy.

On August 2, 2006, Dr. Farrow completed a Medical Source Statement Mental (Tr. at 207-209).  He wrote that plaintiff does not have a history of alcohol abuse.  He found that plaintiff was not significantly limited in the following:

o   The ability to understand and remember very short and simple instructions

o   The ability to carry out very short and simple instructions

23

- o The ability to ask simple questions or request assistance

- o The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

He found that plaintiff was moderately limited in the following:

- o The ability to remember locations and work-like procedures

- o The ability to understand and remember detailed instructions

- o The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- o The ability to sustain an ordinary routine without special supervision

- o The ability to make simple work-related decisions

- o The ability to interact appropriately with the general public

- o The ability to be aware of normal hazards and take appropriate precautions

- o The ability to travel in unfamiliar places or use public transportation

He found that plaintiff was markedly limited in the following:

- o The ability to carry out detailed instructions

- o The ability to maintain attention and concentration for extended periods

- o The ability to work in coordination with or proximity to others without being distracted by them

- o The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- o The ability to accept instructions and respond appropriately to criticism from supervisors

- o The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

o   The ability to respond appropriately to changes in the work setting

o   The ability to set realistic goals or make plans independently of others

On September 13, 2006, plaintiff saw Dr. Farrow for individual psychotherapy (Tr. at 211-212).  Plaintiff was on time for his appointment, he was casually dressed and adequately groomed.  He said he was relieved his divorce was final but he continued to obsess on the material items he had to give up and the fact that he hadn't gotten to talk to his son in three years.  Dr. Farrow and plaintiff worked on decreasing anxiety symptoms while increasing mood stabilization.  On a scale of zero to ten with zero being no measurable progress, five being goal partially met, and ten being goal achieved, Dr. Farrow ranked plaintiff a seven.  His GAF was 55-58.  Plaintiff was advised to return in four to six weeks.

On September 22, 2006, plaintiff saw Dr. Bhargava (Tr. at 267-268).  Plaintiff reported feeling more depressed.  He said he had stopped cooking, which he previously enjoyed.  He was sleeping about 14 hours per night.  Dr. Bhargava observed that plaintiff's mood was depressed, his affect restricted, thought process coherent.  He was not suicidal or psychotic.  She assessed,

1.     Increased symptoms

2.     Global Assessment of Functioning Score of 50.

She increased his Zoloft to 150 mg. daily, decreased his Abilify to 10 mg every morning, and prescribed Topamax for mood stabilization "to decrease weight gain."

On September 22, 2006, Elizabeth Bhargava, M.D., completed a Medical Source Statement Mental (Tr. at 250-252).  She found that plaintiff is not significantly limited in the following:

o   The ability to understand and remember very short and simple instructions

o   The ability to interact appropriately with the general public

o   The ability to ask simple questions or request assistance

o   The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

o   The ability to be aware of normal hazards and take appropriate precautions

She found that plaintiff was moderately limited in the following:

o   The ability to remember locations and work-like procedures

o   The ability to carry out very short and simple instructions

o   The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

o   The ability to sustain an ordinary routine without special supervision

o   The ability to work in coordination with or proximity to others without being distracted by them

o   The ability to make simple work-related decisions

o   The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

o   The ability to accept instructions and respond appropriately to criticism from supervisors

o   The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

o   The ability to respond appropriately to changes in the work setting

o   The ability to travel in unfamiliar places or use public transportation

o   The ability to set realistic goals or make plans independently of others

She found that plaintiff was markedly limited in the following:

o   The ability to understand and remember detailed instructions

o   The ability to carry out detailed instructions

o   The ability to maintain attention and concentration for extended periods

On October 31, 2006, plaintiff saw Dr. Bhargava and stated he was "doing better" (Tr. at 265-266).  Plaintiff reported feeling tired during the day, but said he was having no problems with the Topamax.[12]  "He has obtained some settlement with the divorce.  However, due to the money that he got he might lose his Medicaid and this has been worrying him."  Dr. Bhargava observed that plaintiff was "casually groomed. His mood was less depressed and affect brighter. Thought process was coherent.  He was not suicidal or psychotic."  She assessed

1.   Doing better

2.   Global Assessment of Functioning 60.

She continued his Zoloft, discontinued the Abilify, and increased his Topamax.

On November 15, 2006, plaintiff saw Dr. Farrow for individual psychotherapy (Tr. at 263-264).  Plaintiff was on time, casually dressed and adequately groomed.  Plaintiff reported hypervigilence, ruminating thoughts, easily distracted, increased obsessive thoughts.  "Mr. Marques' significant other is very frustrated with his behaviors and lack of focus on the relationship.  He has been obsessing about buying cars at the cost of ignoring other aspects of his life."  On a scale of zero to ten with zero being no measurable progress, five being goal partially met, and ten being goal achieved, Dr. Farrow ranked plaintiff a seven.  His GAF was 55-58.

_____

[12]Treats bipolar disorder.

On January 12, 2007, plaintiff saw Thomas Nixon, a licensed clinical social worker, at Behavioral Health Care (Tr. at 261-262). Plaintiff arrived early for his appointment and was adequately groomed. This was the first time plaintiff saw Mr. Nixon after Dr. Farrow passed away. Plaintiff reported depression and feelings of hopelessness. Plaintiff talked about hoarding and how it began when he was a child and was not allowed in the refrigerator - he began keeping a drawer full of candy in his room. "He repeatedly discussed his ex-wife not appreciating him, discarding his things and depleting his finances. He was tearful through most of the session today." Plaintiff's GAF was 54-57.

On April 18, 2007, plaintiff saw Thomas Nixon at Behavioral Health Care for a clinical assessment (Tr. at 258-260). Plaintiff reported mood swings, concentration problems, loss of interest, and feeling numb and nervous. Plaintiff said he has to has things and will sometimes stop to pick something up off the side of the road.

**Changes in past year:**
**Personal:** "Like in conversations sometimes, like my opinion don't mean nothing, and I feel like a piece of crap." He reports that he has been having some problems with some of his friends. "It's like they use you. They borrow things and stuff like that. I was really upset when Dr. Farrow died. That was really painful."
* * * * *
**Treatment:** Since 2005 Donald had been seeing Jeff Farrow, Psy.D. for psychotherapy and Elizabeth Bhargava, M.D., for pharmacotherapy. Dr. Farrow passed away in December 2006. Donald had last seen him in November 2006. He saw this therapist in January 2007 and did not return till today's date. He blames his wife for this stating that she was having problems and didn't keep up with his appointments. He cancelled appointments for medication and therapy in February and no showed an appointment for medications last week.
* * * * *
**Assessment of Pain:** Current Pain: Yes. Location: Lower left side. Duration: Off and on for about a year. Frequency: 2 or 3 times a week. . . . "His wife notes that he seems to get the pain after he drinks beer.

Plaintiff was adequately groomed, his thought flow and associations were within normal limits, his thought content was primarily concrete with some ability for abstract reasoning. His mood was anxious, he reported sleeping fine, he denied hallucinations and delusions. He was fully oriented, and his memory was within normal limits. Plaintiff was assessed with obsessive compulsive disorder, bipolar disorder type I, and a GAF of 48-50.[13]

On May 30, 2007, plaintiff saw Thomas Nixon at Behavioral Health Care for individual psychotherapy (Tr. at 256-257). Plaintiff was on time, was casually dressed and well groomed. Plaintiff reported anxiety and recent depression. "He stated he had been upset with a friend who was supposed to buy a car and then didn't make payments to him. He discussed wanting to buy a 1974 Ford Maverick but not having the money." Plaintiff's GAF was 58-60.

On June 13, 2007, plaintiff saw Thomas Nixon at Behavioral Health Care for individual psychotherapy (Tr. at 254-255). Plaintiff was on time, he was casually dressed and adequately groomed. His mood was anxious. Plaintiff reported feeling frustrated, anxious, having mood swings, loss of interest and sleep problems. "He stated that he was so upset he couldn't sleep because he traded 2 cars to a man for a truck and the man took one of the cars to a scrap yard and junked it. He was upset that the man would destroy a car in good running condition, angry and thinking that he wanted to have nothing else to do with the man. He frequently switched subjects during interview today and seemed to have difficulty staying on track." On a scale of zero to ten with zero being no measurable progress, five being goal partially met, and ten being

---

[13]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

goal achieved, Mr. Nixon ranked plaintiff a five. His GAF was 58-60.

On June 28, 2007, plaintiff saw Dr. Bhargava (Tr. at 314-315). This was plaintiff's first visit with Dr. Bhargava since the previous October. He told her he could not come in for the medication because he lost his Medicaid because of the money he got from his divorce. "He is now on the Department of Mental Health." Plaintiff's girl friend described him as unbearable to live with. "He has mood swings, he has problems with focusing, he acknowledges periods of depression. He is easily distractible." Dr. Bhargava observed that plaintiff was talkative, his mood was "fairly good today", his affect was bright, his thought process was somewhat circumstantial. She assessed him as mildly hypomanic with a GAF of 60. She reinstated Topamax and Wellbutrin.

On July 18, 2007, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 312-313). He was on time, casually dressed, and adequately groomed. His mood was depressed and anxious. Plaintiff reported problems with concentration, sleep, and mood swings. He said he was worried that he let a man have two cars without getting the money first and the man skipped town. Plaintiff's girl friend reported that he is up every time the dogs bark for fear someone is bothering his cars. "He appeared almost child like in his presentation, frequently asking questions, having problems comprehending answers. . . . He has applied for disability, but apparently is having problems following through with some of the things he needs to do. His wife works and cannot walk him through the steps he needs to take and he seems to have difficulty understanding what he needs to do. . . . Therapist has difficulty seeing this client having worked as a prison guard for 20 years when he has such a trusting inocense [sic] and naivete about him." Plaintiff's GAF was 51-53. He was told to return in two to four weeks.

On July 25, 2007, plaintiff saw Dr. Bhargava (Tr. at 310-311). Plaintiff and his girl friend reported that plaintiff recently purchased two cars which he later determined were not worth the money he paid for them, and that made him depressed. He reported binge drinking and drinking excessively when his friends come around. He reported overeating to the point of throwing up whenever he goes to a buffet. He reported loneliness now that his girl friend was working. Dr. Bhargava noted that plaintiff had lost five pounds. His mood was depressed and his affect was tearful. His thought process was coherent. She assessed him with "increased symptoms" and a GAF of 55. She increased his Topamax and Wellbutrin and encouraged him to go to Dual Diagnosis Group.

On September 5, 2007, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 308-309). Plaintiff was on time, was causally dressed, and adequately groomed. "Donald states that he has not come to the Dual Diagnosis group because he has been preoccupied with some problems. He denies that he has been drinking excessively and reports that he has cut back his drinking. He was upset about having allowed a young couple, the daughter of a friend and her boyfriend, [to] move into his trailer on 14 highway. The deal was that they would fix the place up in exchange for no rent for a couple of months. Instead, they never switched the electric to their names, and stole items from off the property. He is now having to deal with the legalities of eviction and having to press charges." Plaintiff's GAF was 51-53. He was told to return in two to four weeks.

On September 12, 2007, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 306-307). Plaintiff was on time, was casually dressed and adequately groomed. Plaintiff did not think his medication was working because he was having trouble sleeping. He complained that

the people he rented to were stealing from him, that neighbors were complaining to him, and that his wife got fired. Mr. Nixon told plaintiff that other people going through things like this would have trouble sleeping and would feel anxious. "Therapist suggested that it may not be that his medications are not working but that his current level of stress is over loading the medications a bit and that he needs to be taking other actions to deal with his stress." Plaintiff's GAF was 48-50. He was told to return in two to five weeks.

On October 11, 2007, plaintiff saw Dr. Bhargava (Tr. at 304-305). "Mr. Marques states he has been doing all right. His girlfriend indicates he has been irritable at times. He does not like taking his medication. He tells me he does not feel like he needs to take the Trazodone on days when he is tired. He does a lot of the cooking and cleaning at the home. His girlfriend is currently dealing with severe back pain." Dr. Bhargava observed that plaintiff's mood was fair, his affect was reactive and appropriate, thought process was coherent. "He does have some degree of impulsivity and tends to butt in on his girlfriend's conversation." The assessment is listed as, "Doing fairly [sic]. GAF 60."

On October 25, 2007, plaintiff had a psychological assessment done by Stacy Bray, Psy.D., at the request of Dr. Bhargava (Tr. at 298-301). Dr. Bray administered the Wechsler Adult Intelligent Scale 3rd and a Neurobehavioral Cognitive Status Examination ("cognistat").

> Mr. Marques worked in corrections for 20 years being promoted to the rank of Sergeant. He reported no particular problems during employment until he left. He reported he went through a difficult divorce, developed a mood disorder and was no longer able to work. He reported emotional difficulties since that time. He now collects and occasionally sells cars. He receives disability.

* * * * *

He reported no abuse or dependence to alcohol or drugs. His chart indicates a pattern of binge drinking.

He is currently living with his wife whom he relies on to help with his memory, concentration, and daily functioning.

* * * * *

BEHAVIORAL OBSERVATIONS

Mr. Marques was alert and oriented to everything except time. During the interview, he was highly distractible and had difficulty maintaining the focus of the interview easily drifting off to unrelated topics. During the interview, he required a lot of redirection. . . . He was cooperative with the testing process and required less direction to remain on task than in the interview. . . . His mood was good. . . . Multiple times he became tearful and his voice tone expressed emotion. This happened both with interviewing him and when performing tasks. He lacked frustration tolerance. He talked himself through many of the performance tasks often criticizing his own performance. On the performance subtests, he often evidenced no problems with the tasks until the tasks became more complex either with color or design. When this happened, he seemed overwhelmed with the tasks and evidenced immediate difficulty with completion of the task. At one point, when overwhelmed, he asked for a bathroom break. He was encouraged to complete the task, and did so, before taking a break. Although, he voiced self-criticism, when asked his perception of his performance, he responded he thought he performed "probably not too bad."

RESULTS

* * * * *

**Full Scale IQ** = 74 with a 95% confidence level that his true IQ falls within the range of 70-79.
**Verbal** = 72; **Performance IQ** = 79
This places Mr. Marques in the borderline range of intellectual functioning between low average and mild mental retardation.

Relative strengths are determined from comparing the individual's performance within itself rather than to a normative population. He evidenced relative strengths in common sense and visual reasoning/visual problem-solving. He performed significant[ly] better in these areas than others assessed.

Cognistat

Mr. Marques['s] performance on the cognistat indicate[s] average performance in the cognitive areas of language including comprehending language, expressing language, and naming; construction ability; calculations; and reasoning including abstract thinking and judgment.

His performance in attention and memory were quite different. He performed in the moderate to severe range of impairment for attention and the severe range of impairment for memory.

As with the first test, he became overwhelmed when the tasks became more complex and was not able to complete the tasks. He usually attempted the tasks and recognized when he performed it [sic] inaccurately. He evidenced he is capable of abstract reasoning abilities when not overwhelmed with complexity and/or symptoms of his disorder. He easily becomes overwhelmed when a task becomes complex and strains his coping skills.

On November 12, 2007, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 302-303). Plaintiff was on time, casually dressed, and adequately groomed. His mood was anxious. "His wife complains that he has been pestering her because she has been sleeping a lot. She is due to have back surgery." Mr. Nixon suggested plaintiff be more patient with his wife's pain and medication sedation. Plaintiff's GAF was 51-53. He was told to return in two to four weeks.

Although plaintiff had just seen Mr. Nixon four days earlier, on November 16, 2007, he returned for individual psychotherapy (Tr. at 296-297). Plaintiff was on time, casually dressed, and adequately groomed. His mood was anxious. "Donald reported feeling scattered, numb and worried. He came in reporting that he realizes that he has a drinking problem and states that he drinks 2 to his wife's 1. He discussed frustration with her not helping around the house. He reflects a lot of dependency on others, and feels that he could not make it on his own if he was not with her." Mr. Nixon gave plaintiff contacts for Alcoholics Anonymous. Plaintiff's GAF

was 48-50.  He was told to return in four to five weeks.

On November 20, 2007, plaintiff saw Dr. Bhargava (Tr. at 292-293).  "Mr. Marques states that he has been stressed due to a quarrel that he has had with his neighbor's boyfriend, who has just come out of jail.  He shows me a scar on his neck where he was scratched, thought it was his nail, but actually it was a knife.  He is anxious at the thought the he could potentially have been killed. He states he had allowed this neighbor to use his car while the boyfriend was in prison.  He would like his girlfriend to go and pick up the car.  He does not want to mess with them again.  He reports being compliant with medication.  He does indicate that he drank a couple of days ago.  He did have his psychological testing done, which showed an IQ in the range of 72 to 79.  He has significant problems with distractibility and poor frustration tolerance. His girlfriend complains of him being irritable."  On exam, plaintiff's thought process was coherent.  He was assessed with "Some continued symptoms in the face of stressors."  His GAF was 58.  Dr. Bhargava continued plaintiff on Wellbutrin and Trazodone and increased his Topamax to 100 mg twice a day.

On November 21, 2007, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 294-295).  Plaintiff was on time, casually dressed and adequately groomed.  His mood was anxious.  "He reported that he has not been drinking in the past week and that he has some fears of his drinking keeping him from being able to get his disability.  He presented a letter from his attorney stating to him that drugs or alcohol cannot be the 'material factor' in his disability.  He wonders if he had a stroke and states that he didn't used to have these problems of memory and labile mood."  Mr. Nixon told plaintiff that his diagnosis is alcohol abuse, not alcohol dependance and that "it is not a material factor in his disability."  Mr. Nixon wrote, "Therapist

35

reflected on his problems with memory and change in level of functioning and understanding as being the primary factor in his disability. Therapist when reviewing testing had suggested neurological work up but he can't afford that and does not have medicaid. Therapist recommended that he auction all his cars off and use that money to pay for an [sic] neurological work up. Therapist educated about how medicaid determines assets, and therapist will email Dr. Bhargava and Dennis Lawson regarding recommendations for him. Therapist gave him a list of things to inform his attorney about." Plaintiff's GAF was 51-53. He was told to come back in two to four weeks.

On November 29, 2007, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 290-291). Plaintiff was on time, casually dressed, and well groomed. His mood was anxious. Plaintiff had been using abusive language with his girl friend - she said he was getting angry with her for not helping him organize his piles of belongings. "He continues to obsess about his vehicles and reports that people have been coming around his property and snooping, possibly stealing parts out of the vehicles. He resists the idea of selling all his vehicles although he will state that he knows he needs to let them go and does not enjoy his hoarding. He reports that as of tomorrow he has not had anything to drink in 2 weeks." Plaintiff's GAF was 48-50. He was told to return in two to three weeks.

On December 12, 2007, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 288-289). Plaintiff was on time, was casually dressed and adequately groomed. His mood was anxious. Plaintiff complained about getting frustrated with his girl friend when she will not watch television with him. Plaintiff continued to remain sober. Mr. Nixon suggested plaintiff and his girl friend schedule TV time together and that "his partner's choices are ultimately none

of his business unless it is causing him some form of harm." Plaintiff's GAF was 48-50. He was told to come back in three to four weeks.

On December 21, 2007, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 286-287). Plaintiff was on time, casually dressed, and well groomed. His mood was anxious. Plaintiff and Mr. Nixon worked on ways to cope with anxiety. Plaintiff's GAF was 48-50. He was told to return in three to four weeks.

On January 3, 2008, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 284-285). Plaintiff was on time, he was casually dressed and well groomed. His mood was anxious. Plaintiff continued to complain about his girl friend not paying attention to the things he thinks need attention; talked about catching his ex-wife having an affair before their divorce. "He continues to be somewhat scattered in his presentation. . . . Therapist asked him to review his history and pointed out to him how he appears to have difficulty focusing and yet when he worked as a prison guard being able to focus was very important and he could get hurt if he was easily distracted. Therapist asked him to write a history of his hoarding from as far back and he can remember to present and to write about the first time that he recalls having difficulty focusing or being easily distracted, and what was going on in his life at that time." His GAF was assessed at 48-50. Plaintiff was told to return in two to four weeks.

On January 15, 2008, plaintiff saw Dr. Bhargava (Tr. at 282-283). Plaintiff rated his depression a 4 to 6 on a scale of 1 to 10. He complained a lot about his girl friend not meeting his needs. "His complaint is that she does not stay up with him to watch movies. She is not as sexually active as he would like. They are obviously very fond of each other. He also complains that he has to do most of the housework. He is not as irritable. However, he is very talkative

throughout this interview and is hard to interrupt. His girlfriend tells me he tends to take only 50 mg of the Topamax a day. He cannot identify why he does not like the higher dose." His assessment was listed as, "Some noncompliance. GAF 60." Dr. Bhargava encouraged plaintiff to take the 100 mg of Topamax twice a day, continue Wellbutrin and Trazodone. He was noted to have been abstinent from alcohol for 60 days. She recommended he return in six weeks.

On January 29, 2008, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 280-281). Plaintiff was on time, was causally dressed and adequately groomed. His mood was anxious. "Donald . . . discussed being frustrated on his birthday. Although his girlfriend took him out and bought him a lot of cloths [sic], he discounted the whole thing because she was in a different isle [sic] buying cat food when he wanted to show her a shirt he liked." Plaintiff reported being physically and emotionally abused by his father, but when he visited his grandparents he was pampered and things were bought for him." Plaintiff's GAF was 48-50. He was told to return in three to five weeks.

On February 5, 2008, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 278-279). Plaintiff was on time, was casually dress and adequately groomed. His mood was anxious. They discussed how his father's neglect may have led him to develop the idea that getting new things is love; they worked on ways for plaintiff to cope with feelings of emptiness rather than trying to consume enough things to compensate. His GAF was 48-50. He was told to return in two to four weeks.

On February 13, 2008, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 276-277). Plaintiff was on time, was casually dress and adequately groomed. His mood was normal. Plaintiff reported getting upset with his girl friend for not getting ready when he thinks

she should.  Plaintiff said he did not think his medication was helping his OCD.  Plaintiff's GAF was 48-50.  He was told to return in two to five weeks.

On February 18, 2008, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 274-275).  Plaintiff was on time, casually dressed and adequately groomed.  His mood was anxious.  "Symptoms reported and behaviors related to the diagnosis evident at the time of this session include:  Donald reported feeling happy and content but reported mood swings.  When asked about this he noted that he had been having outbursts of anger.  He stated that people have been stealing from him and reported that the hood ornament from his 1940's Oldsmobile was stolen.  He reported that he has 20 to 30 cars, and that he worries constantly about people stealing from him or damaging the cars.  He also reported buying 2 pairs of pants recently and then didn't have enough cash left to get a tire mounted."  Mr. Nixon believed plaintiff was getting too much therapy:  "Therapist suggested to Donald that he is getting too much therapy as he is coming to group weekly and has been scheduling individual weekly as well.  Therapist suggested that he work on being more involved in group and that he begin cutting individual sessions back to once a month or less."  Plaintiff indicated feelings of abandonment about Mr. Nixon recommending that plaintiff have less therapy.  His GAF was assessed at 48-50.

On February 26, 2008, plaintiff saw Dr. Bhargava (Tr. at 272-273).  "He was wondering if there was another medicine for compulsive disorder that I could put him on.  He indicates that his therapy has been very helpful.  He does not report significant depression.  He has not been taking the Trazodone and is sleeping well.  He has been compliant with his other medications."  She assessed, "1.  Some continued symptoms, 2. Global Assessment of Functioning Score of

60." She started him on Clomipramine,[14] decreased his Wellbutrin "due to him being on too much of an antidepressant", continued the Topamax, and discontinued the Trazodone which he had not been taking.

On March 3, 2008, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 270-271). Plaintiff was early for his appointment, he was casually dressed and well groomed. His mood was anxious. He reported that he was feeling frustrated. "He apparently had been arguing with [h]is partner over some petting [sic] things related to shopping. He discussed his relationships with neighbors and people taking advantage of him. He discussed frustration with various different times that people have treated him disrespectfully." On a scale of zero to ten with zero being no measurable progress, five being goal partially met, and ten being goal achieved, Mr. Nixon ranked plaintiff a two. His GAF was 51-53.

On March 28, 2008, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 331-332). Plaintiff was on time, casually dressed, and adequately groomed. His mood was anxious. Plaintiff reported feeling "scattered." He reported that Luvox had helped with his rumination of thought, but he stopped taking it because it gave him erectile problems. Plaintiff's GAF was 51-53.

On April 10, 2008, plaintiff saw Dr. Bhargava (Tr. at 329-330). His diagnosis was bipolar disorder and alcohol abuse in early remission. Plaintiff's mood was moderately depressed; his affect was tearful at times. His thought process was coherent. He was assessed with "some continued symptoms" and a GAF of 60. She continued plaintiff's medications and

---

[14]An antidepressant used to treat obsessive compulsive disorder.

also started him on Remeron. "He is not very good about being compliant with his medications."

On April 10, 2008, Dr. Bhargava completed a Medical Source Statement - Mental (Tr. at 316-318). She found that plaintiff was not significantly limited in the following:

o   The ability to understand and remember very short and simple instructions

o   The ability to carry out very short and simple instructions

o   The ability to ask simple questions or request assistance

o   The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

o   The ability to be aware of normal hazards and take appropriate precautions

She found that plaintiff was moderately limited in the following:

o   The ability to remember locations and work-like procedures

o   The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

o   The ability to sustain an ordinary routine without special supervision

o   The ability to work in coordination with or proximity to others without being distracted by them

o   The ability to make simple work-related decisions

o   The ability to interact appropriately with the general public

o   The ability to accept instructions and respond appropriately to criticism from supervisors

o   The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

o   The ability to respond appropriately to changes in the work setting

o   The ability to travel in unfamiliar places or use public transportation

o   The ability to set realistic goals or make plans independently of others

She found that plaintiff was markedly limited in the following:

o   The ability to understand and remember detailed instructions

o   The ability to carry out detailed instructions

o   The ability to maintain attention and concentration for extended periods

o   The ability to complete a normal workday and workweek without interruptions from
    psychologically based symptoms and to perform at a consistent pace without an
    unreasonable number and length of rest periods

On April 11, 2008, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 327-328).  Plaintiff was on time for his appointment; his mood was normal.  Plaintiff reported feeling okay.  He complained about neighbors and people borrowing money from him and not paying it back.  Plaintiff's GAF was 51-53.

On May 6, 2008, plaintiff saw Dr. Bhargava (Tr. at 325-326).  His diagnosis was bipolar disorder and alcohol abuse in early remission.  Plaintiff reported being more stressed lately because he learned his ex-wife had a restraining order against him and that he violated it when he wrote letters to his children.  Plaintiff reported spending $4,000 on a tractor which used up most of his money.  "He states his mood was pretty good up until he got the news of the restraining order."  He was assessed with "some continued symptoms" and a GAF of 60.  Dr. Bhargava continued plaintiff on his medications.

On May 19, 2008, plaintiff saw Thomas Nixon for individual psychotherapy (Tr. at 323-324).  Plaintiff was on time for his appointment.  Plaintiff reported worry due to his girl friend being in surgery to remove colon cancer, and he reported that she also had spots on her lungs and

was told that she was going to die.  Plaintiff's GAF was 54-57.

On June 3, 2008, plaintiff saw Dr. Bhargava (Tr. at 321-322).  His diagnosis was bipolar disorder and "alcohol abuse in early remission".  Plaintiff reported being worried about his girl friend who was diagnosed with colon cancer.  She had surgery during the past month and was facing chemotherapy.  Plaintiff rated his depression a four or five out of ten.  He was sleeping about twelve hours per night.  Plaintiff had lost six pounds.  Dr. Bhargava observed that his mood was moderately stressed.  His thought process was coherent.  He was assessed with "Doing better. GAF of 62."  Dr. Bhargava continued plaintiff on his same medications and said to return in 10 to 12 weeks.

## C.  SUMMARY OF TESTIMONY

During the June 24, 2008, hearing, plaintiff testified; and Sandra Schneider, a vocational expert, testified at the request of the ALJ.

### 1.  Plaintiff's testimony.

At the time of the hearing plaintiff was 49 years of age and is currently 51 (Tr. at 30).  He is 6 feet tall and weighs about 217 pounds (Tr. at 30).  Plaintiff said he is right handed but he writes with his left hand (Tr. at 30).  Plaintiff has a high school education (Tr. at 31).  Plaintiff lives with his fiancée (Tr. at 31).  He drives occasionally (Tr. at 31).

Plaintiff last worked in 2004 or 2005 as a prison guard in a Florida prison (Tr. at 32, 34).  Plaintiff was a supervisor over approximately 15 to 20 guards (Tr. at 32-33).  Plaintiff left that job because he was going through a divorce, he was depressed and was going through counseling; he was out sick for a long time and then he was let go (Tr. at 34-35).  Plaintiff testified that he cannot work because he keeps forgetting things, he cannot focus, he gets upset

and emotional, and "things bring back memories" (Tr. at 36).

Plaintiff has trouble following a television program, he has to be reminded to take his medication, and he has trouble with sleeping[15] (Tr. at 37). Plaintiff has trouble going to sleep because his "mind is going, . . . [t]hinking about different things. It's always because of my compulsiveness. It's always wandering." (Tr. at 37).

Plaintiff likes to go to buffets a couple times a week and he overdoes it (Tr. at 38). His girl friend has to remind him to bathe, but he otherwise needs no assistance with that or dressing (Tr. at 38-39). Plaintiff can prepare simple meals for himself and clean up afterwards (Tr. at 39). He testified that he does not go shopping because he will want too many things that he cannot afford; however, he also testified that he was last shopping at Wal-Mart a "few days" before the hearing to get some coffee creamer (Tr. at 39). Plaintiff has a low energy level (Tr. at 41). He feels worthless on a daily basis (Tr. at 41-42). Plaintiff has crying spells every couple of days (Tr. at 43). Plaintiff hoards things, and he goes outside in the dark to check things every time he hears a dog bark (Tr. at 43-44). A few days per week plaintiff will sleep until 11:00 or noon because he does not want to get up right away (Tr. at 44).

Plaintiff's family members live out of state and he visits with them by telephone (Tr. at 41).

---

[15]Plaintiff testified that he has trouble "going to sleep and then I can't, and then I hear the dogs bark. I have a problem sometimes falling asleep, and sometimes I have, and then in the morning getting up" (Tr. at 37).

**2.      Vocational expert testimony.**

Vocational expert Sandra Schneider testified at the request of the Administrative Law Judge.  The vocational expert testified that plaintiff's past relevant work was as a correctional officer (Tr. at 48).

The first hypothetical involved a person who has no exertional, postural, or environmental limitations; who was limited to simple, routine, repetitive, low-stress tasks which would permit occasional decision-making, changes in the work setting, occasional exercise in judgment, no production rate pace work or negotiation work, only occasional interaction with the public and co-workers, and limited to superficial non-confrontational type of contact (Tr. at 48-49).  The vocational expert testified that such a person could not perform plaintiff's past relevant work; however, the person could be a hand packager, D.O.T. 920.587-018, with 8,000 jobs in Missouri and 110,000 in the country; a janitor, D.O.T. 381.687-018, with 5,000 jobs locally and 60,000 in the nation; or a courier, D.O.T. 230.663-010, with 6,000 locally and 103,000 nationally (Tr. at 49).

The second hypothetical was the same as the first except the person would be off task about 20% of the day due to problems concentrating (Tr. at 49-50).  The vocational expert testified that such a person could not work (Tr. at 50).

*V.      FINDINGS OF THE ALJ*

Administrative Law Judge Jeffrey Hatfield entered his opinion on July 21, 2008 (Tr. at 10-24).

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 12).

Step two. Plaintiff suffers from bipolar disorder and obsessive compulsive disorder, which are severe impairments (Tr. at 12).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 12).

Step four. Plaintiff retains the residual functional capacity to perform work at all exertional levels but is limited to simple routine repetitive tasks that are "low stress," which is defined as permitting occasional decision-making, occasional changes in the work setting and occasional exercise of judgment, no production rate or pace work, occasional interaction with the public and coworkers, and limited to superficial non-confrontational and non-arbitration/negotiation types of interaction (Tr. at 13). With this residual functional capacity, plaintiff cannot return to his past relevant work (Tr. at 23).

Step five. Plaintiff can perform the jobs of hand packager, janitor, and courier, all of which are available in significant numbers in the regional and national economies (Tr. at 23-24).

## VI. *OPINIONS OF TREATING PSYCHIATRIST AND PSYCHOLOGIST*

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinions of Dr. Bhargava and Dr. Farrow that plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods of time and Dr. Farrow's opinion that plaintiff is markedly limited in the ability to "complete a normal workday and work week without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods."

The ALJ had this to say about Dr. Bhargava, plaintiff's psychiatrist, and Dr. Farrow, plaintiff's psychologist:

46

The undersigned . . . does not give any weight to the mental medical source statements from Dr. Farrow (Exhibit 13F) and Dr. Bhargava (Exhibits l5F and 18F). The assessed limitations in these forms indicate that the claimant would be unable to understand, carry out and remember simple instructions, respond appropriately to supervision, coworkers and usual work situations, and to deal with changes in a routine work setting on a regular and consistent basis. However, the assessed limitations are not supported by findings from a mental status examination or psychological testing, or findings from clinical examinations. The assessed limitations are also not consistent with the longitudinal treatment records, particularly those from Dr. Bhargava. Dr. Bhargava's treatment records from November 2005 to June 2008 consistently show mild or normal findings in the claimant's mood, affect, thought process and thought content on repeated clinical examinations. The claimant generally reported that his depression was mild. The claimant had some stress and anxiety from stressors in his life including issues over his divorce from his ex-wife and relational problems with his girlfriend, which Dr. Bhargava believed were not more than what one would expect in a co-habitating couple (Exhibit l4F 117). Dr. Bhargava's treatment notes since May 19, 2006, approximately 7 months after the claimant began treatment with Dr. Bhargava, generally show GAF scores of at least 60, which according to the DSM-IV TR indicates moderate, bordering on mild, symptoms and difficulty in social, occupational or school functioning. The undersigned notes that Dr. Bhargava gave a GAF of 50 on September 22, 2006, when claimant reported exacerbation in his depression, and that was the same day that Dr. Bhargava completed the September 22, 2006 medical source statement. Dr. Bhargava gave a GAF of 55 on July 25, 2007, when the claimant reported that he was very depressed and has compulsive behaviors; however, he also admitted to binge drinking and drinking excessively when his friends come around (Exhibit 17F/42). The treatment records indicate that the claimant continued to drink alcohol heavily until the end of November 2007 (Dr. Bhargava gave a GAF of 58 on November 20, 2007 after he reported having a quarrel with his neighbor's boyfriend and drinking a couple of days ago). The treatment records also indicate that the claimant stopped drinking after November 2007 and has been going to a Dual Diagnosis group. Dr. Bhargava's treatment notes since January 2008 consistently show GAF scores of at least 60. Thus, it appears from the treatment records that the claimant had some exacerbation in his symptoms secondary to alcohol abuse (Mr. Nixon told the claimant on November 21, 2007 that his diagnosis is "alcohol abuse") during the period from July 2007 to November 2007, but once he stopped drinking his symptoms improved and his GAF scores returned to 60 and above.

The undersigned does not give weight to the GAF of 44 from Dr. Bhargava's initial evaluation in October 2005 because it was from an initial evaluation without the benefits of treatment and longitudinal observation, and is not consistent with her subsequent treatment notes and GAF assessments.

The treatment records from Dr. Farrow and Mr. Nixon, the claimant's therapists, show GAF scores that are significantly lower (generally in the low to mid 50's range) than

those given by Dr. Bhargava.  However, the treatment notes from the therapists follow a format of listing the claimant's symptoms and subjective complaints and course of treatment, with no evidence of mental status examinations. The therapists did not document most of the psychiatric signs ordinary evaluated on a mental status examination, such as abnormalities in affect, mood, thought process, insight, recall, attention and concentration, etc.  Instead of making independent clinical observations of abnormalities and the claimant's mental status, the therapists merely restated the claimant's subjective perceptions of his problems (see 20 CFR 404.l528(b) & (c); 416.928(b) & (c), explaining that symptoms are the claimant's description of his or her impairment, while psychiatric signs are medically demonstrable and observable phenomena which indicate specific abnormalities of behavior, affect, thought, memory, orientation, and contact with reality).  The undersigned rejects their GAF assessments because the therapists did not document the requisite clinical signs, but relied almost wholly on the claimant's own description of his symptoms.  In contrast, Dr. Bhargava performed a mental status examination during each and every one of the claimant's visits, and she detailed those findings and gave an assessment of the claimant's current situation.  Therefore, the undersigned gives greater weight to the GAF assessments from the claimant's treating psychiatrist than to those from the therapists.  Dr. Bhargava also prescribed the claimant's medications and, therefore, she is more familiar with his response to, and compliance with, medications.

(Tr. at 20-21).

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor.  20 C.F.R. § 404.1527(d)(2) - (5).

It is undisputed that the length of the treatment relationships, the frequency of exams (or at least visits), the nature and extent of the treatment relationships, and the specialization of the doctors support the doctors' credibility. The main issues are supportability by medical signs and laboratory findings and the consistency of the opinions with the record as a whole. The ALJ adequately discussed these two factors as to each treating source. A thorough review of the record supports the ALJ's decision to discredit the two Medical Source Statements.

Dr. Farrow

On August 2, 2005, plaintiff was only mildly depressed.

On September 21, 2005, Dr. Farrow performed a mental status exam which says, "see attached Mental Status Examination sheet" but this sheet was not in the record. Assuming the testing supported the findings, Dr. Farrow assessed a GAF of 50-60 currently and 60-70 within the past year. Those scores range from mild symptoms to moderate symptoms. Dr. Farrow found that plaintiff's persistent thoughts and impulses were "not particularly excessive" and that plaintiff "worries about real-life problems." He found that plaintiff had good verbal skills and appeared to be of average intelligence.

On November 9, 2005, plaintiff's mood was normal.

The second lengthy record occurred on November 16, 2005, in connection with plaintiff's disability application. His mood was only mildly anxious and mildly depressed, his affect was appropriate, he drove himself to the appointment and was on time. Plaintiff was on Zoloft and Seroquel and he said, "I guess they're working."

All of Dr. Farrow's diagnoses were supported only by plaintiff's allegations. For example, Dr. Farrow found that plaintiff met the diagnostic criteria for Bipolar I Disorder, most

recent episode mixed, moderate, supporting his finding with "Mr. Marques reported . . ." Dr. Farrow found that plaintiff met the diagnostic criteria for Obsessive Compulsive Disorder, and he supported that finding with "He reported. . . ."

Dr. Farrow's *observations* in this lengthy report were that plaintiff's "mood was mildly depressed and mildly anxious" and plaintiff's memory was rated as "fair." His GAF was 50-60 with a GAF of 60-70 over the last year, meaning mild to moderate symptoms.

In conclusion, Dr. Farrow found that plaintiff "did not demonstrate any difficulties in his ability to understand and remember simple instructions, moderately complex level instructions, or complex level instructions." Plaintiff "was able to sustain concentration and persistence on simple tasks, moderately complex level tasks, and complex level tasks during this evaluation." And finally, Dr. Farrow expressed the opinion that plaintiff would be able to consistently and appropriately interact with others - even better if he were in an environment with limited public contact and few inherent hazards.

On his December 8, 2005, visit, plaintiff was on time, and the focal point of the visit was coping with the holidays and being medication complaint. On January 6, 2006, plaintiff was on time and reported only mild racing and ruminating thoughts. On February 13, 2006, plaintiff was on time. He reported memory difficulties; however, the focal issues for this session were dealing with financial stressors and medication compliance.

On March 17, 2006, plaintiff was on time. He reported memory difficulties but Dr. Farrow focused on dealing with divorce, division of property, and legal problems. April 4, 2006, was the only time plaintiff was ever late - to see Dr. Farrow or any other treatment provider. Plaintiff reported mildly expansive mood, racing thoughts, mild pressured speech. The session

focused on coping with ongoing legal problems.  Dr. Farrow believed plaintiff did not need to return for another four to six weeks.

On June 7, 2006, plaintiff was on time and reported only mild symptoms.  The focus of session was making decisions related to divorce proceedings.  Dr. Farrow thought plaintiff only needed supportive therapy every four to six weeks.  On July 5, 2006, they worked on decreasing anxiety.

On August 2, 2006, plaintiff was on time; they worked on coping with financial problems and finalizing a divorce.  August 2, 2006, was also the day Dr. Farrow completed the Medical Source Statement at issue.  He wrote that plaintiff does not have a history of alcohol abuse even though on November 16, 2005, he made a note of plaintiff's alcohol use.  He found plaintiff moderately limited in the ability to maintain regular attendance and be punctual, even though plaintiff had never missed an appointment and had only been late one time during the entire time he was seen by Dr. Farrow.  Dr. Farrow found that plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods, even though Dr. Farrow had never noted any problems with concentration in any therapy record.  He found plaintiff markedly limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, yet his treatment sessions with plaintiff focused almost exclusively on situational stressors such as finances, his divorce, and arguments with his girl friend.  He did not believe plaintiff needed counseling any more than once every four to six weeks, which does not indicate serious symptoms.

Dr. Farrow's findings that plaintiff was markedly limited in his ability to accept instructions and respond appropriately to criticism from supervisors, his ability to get along with

coworkers without distracting them, and his ability to respond appropriately to changes in the work setting are not supported by anything in the treatment records. There were never any complaints, observations, or findings with respect to any of these abilities.

Plaintiff had two more visits with Dr. Farrow after the Medical Source Statement was completed. On September 13, 2006, plaintiff was on time and complained about the material items he had to give up in his divorce. During his final visit on November 15, 2006, plaintiff's girl friend complained that plaintiff was focusing on buying cars instead of focusing on their relationship.

Dr. Farrow never observed any symptoms other than mild symptoms. He did not believe plaintiff needed treatment very often. He consistently focused his therapy sessions on situational matters. And his treatment notes rarely, if ever, reflect any observations or concerns about most of the limitations he found in the Medical Source Statement.

Dr. Bhargava

Like Dr. Farrow, Dr. Bhargava listed much more restrictive findings in her Medical Source Statement than appear in her treatment records. On October 19, 2005, plaintiff or his girl friend reported mild memory problems. Dr. Bhargava noted that plaintiff was not very compliant with medications.

On November 28, 2005, she noted that he was doing better with Seroquel but that he cut his dose in half because he was running out. Plaintiff's girl friend reported that plaintiff was doing better with mood swings and sleep. Dr. Bhargava observed that plaintiff was less depressed, his thought process was coherent, and she assessed him with "significant improvement."

On January 17, 2006, plaintiff reported that he was sleeping well. Dr. Bhargava noted that his mood was fairly good, and she assessed "mild symptoms." On January 30, 2006, plaintiff reported sleeping well. Dr. Bhargava observed that plaintiff was only mildly depressed and his thought process was coherent. On March 9, 2006, she made no adverse findings. On April 20, 2006, plaintiff reported that he was not getting irritable and he rated his depression a three out of ten. Plaintiff and his girl friend complained about one another -- "their issues and reactions that they describe do not appear to be more than what one would expect in a co-habitating couple. I helped them understand that the medications are not going to take away all their problems." Dr. Bhargava observed that plaintiff's mood was fairly good, thought process was coherent, and speech normal; and she assessed him as "doing better."

On May 19, 2006, plaintiff reported doing fairly well, sleeping fairly well, and said he only got irritable occasionally and nothing "out of the way". Dr. Bhargava observed that plaintiff's mood was fair and assessed "fairly stable in spite of stressors." On June 16, 2006, plaintiff reported being anxious about having to go to Florida for his divorce, but "otherwise he has been doing fairly well." He had no significant episodes of irritability. His thought process was coherent, his mood was only mildly anxious, and he was assessed as "fairly stable."

On July 21, 2006, plaintiff reported that he was going to get about $46,000 out of his divorce and did not have to go to Florida after all. He reported occasional depression when thinking about not seeing his children. Dr. Bhargava observed that plaintiff's mood was fairly good, his affect was bright, his thought process was coherent. She noted that plaintiff "continues to be fairly stable."

The only visit during which plaintiff reported or exhibited anything other than mild symptoms occurred on September 22, 2006 -- the day Dr. Bhargava was asked to complete the Medical Source Statement at issue. On that day, plaintiff reported feeling more depressed and sleeping 14 hours per day. Dr. Bhargava observed that his mood was depressed and his affect was restricted, but his thought process was coherent. She assessed increased symptoms. On the next visit, October 31, 2006, plaintiff was "doing better," he was less depressed, his affect was brighter.

Like Dr. Farrow, Dr. Bhargava found plaintiff moderately limited in his ability to maintain regular attendance and be punctual, even though plaintiff had never missed an appointment with her and had never been late. She found plaintiff markedly limited in his ability to maintain attention and concentration for extended periods, even though she never recorded a complaint, observation, or finding with respect to impaired attention or concentration. All of Dr. Bhargava's observations and findings, as recorded in her treatment records, were of normal or mild symptoms. She observed that plaintiff's complaints were about normal difficulties that ordinary couples experience. There simply is no support in her treatment records for the findings in her Medical Source Statement.

The final relevant factor is consistency with other evidence in the record. The bulk of plaintiff's medical records are from Dr. Farrow and Dr. Bhargava. Dr. Burstin, Ph.D., completed a Psychiatric Review Technique on January 3, 2006, finding only mild restrictions of activities of daily living; mild difficulties in maintaining concentration, persistence, or pace; and moderate difficulties in social functioning.

The substantial-evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991); Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988). Based on the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit the opinions of Dr. Farrow and Dr. Bhargava in the Medical Source Statements. The opinions are not supported by medical signs or laboratory findings, and are not supported by the doctors' own treatment records. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VII.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below (20 CFR 404.1529 and 416.929 (incorporating and expanding upon Polaski v. Heckler, 739 F2d 1320 (8th Cir. 1984)); SSR 96-4p; SSR 96-7p.
>
> The claimant's subjective complaints and alleged limitations are not consistent with his treatment. The claimant was not fully compliant with taking his psychiatric medications. The record does not show that he is allergic to or has adverse side effects from every

medication or therapy that could reasonably treat his alleged symptoms. The claimant had no treatment after October 2006 until June 2007. His justification was that he lost his Medicaid because of the money he got from the divorce. However, he reportedly received about $46,000 from his divorce and there is no reason why he could not have used that money to continue treatment, or at least continue to refill his medications. The claimant also had a period of alcohol abuse from July 2007 to November 2007. It is reasonable to assume that if the claimant were experiencing the disabling problems alleged, he would have been fully compliant with treatment.

The claimant's subjective complaints and alleged limitations are not consistent with his activities of daily living. As noted above, the claimant enjoys collecting cars, has a large collection of cars, sells cars occasionally, gets coffee with the "guys" in the morning once in a while, goes to Wal-Mart (a crowded place) and out to dinner with his girlfriend, goes to the post office and grocery store on a regular basis, drives, and talks to his family members on the phone on a regular basis. The claimant enjoyed cooking. He told Dr. Bhargava on October 11, 2007 that he does a lot of cooking and cleaning at home. He also told Dr. Bhargava on January 15, 2008 that he has to do most of the housework. That contradicts the claimant's testimony that he spends most of the time during day watching television and his girlfriend (who was recently diagnosed with cancer and underwent surgery and is supposed to receive chemotherapy) has to do most of the shopping.

(Tr. at 22-23).

Plaintiff's work history and daily activities are not strong factors one way or another in this case.

Duration, Frequency, and Intensity of Symptoms

The record as a whole supports the ALJ's findings that plaintiff's history of treatment does not indicate intense symptoms. Plaintiff went a total of ten months with no treatment at all -- six months before his alleged onset and four months after his alleged onset. In November 2005, Dr. Farrow noted only mild symptoms. In April 2006 plaintiff rated his depression a three out of ten. In May 2006, he reported that he occasionally got irritable but nothing out of the ordinary. In June 2006, he reported that he was doing fairly well. In July 2006 his mood was fairly good and his affect was bright. In June 2007 his mood was fairly good and his affect was

bright.  In October 2007 plaintiff said he was doing alright.  In February 2008 plaintiff's mood

was normal.  Later that month he reported no significant depression and said he was sleeping

well.  In May 2008 he reported his mood had been pretty good.

Precipitating and Aggravating Factors

Almost all of the precipitating and aggravating factors in the record are related to

plaintiff's divorce, his property settlement, his legal difficulties, complaints about his girl friend,

and the deals he was making buying and selling vehicles.  In July 2007, plaintiff experienced

increased symptoms and at the same time reported binge drinking and drinking excessively when

his friends come around.  References to drinking continued into November 2007.

Dosage, Effectiveness, and Side Effects of Medication

In November 2005, at the beginning of plaintiff's treatment, he told Dr. Farrow that he

had not been on any medication in over a year but had started Zoloft and Seroquel which were

"working."  Later that month, Dr. Bhargava noted that plaintiff had experienced "significant

improvement" since he had been on Seroquel.  The majority of the references in the records

indicate that plaintiff's medication worked satisfactorily when he took it as directed.

**B.      *CREDIBILITY CONCLUSION***

In addition to the factors discussed above, the ALJ relied on plaintiff's non-compliance in

finding him not entirely credible.  Especially because this is a mental-impairment case, plaintiff

argues that his non-compliance does not support the ALJ's credibility finding.  I disagree.

In November 2005, plaintiff cut his Seroquel dosage in half because he was running out

of his medicine, not because his mental illness interfered with his ability to remember to take it.

Plaintiff had not signed up for the Solutions to Wellness program as directed in June 2006, but

gave no reason.  At the time, however, he had been keeping himself "really busy."  In July 2006 plaintiff had not been working on his diet and exercise because it was too hot outside.  As the ALJ pointed out, during the second half of 2006 and the first half of 2007 plaintiff stopped treatment and medication because he could not get it free due to his divorce settlement.  Clearly if plaintiff's symptoms were as bad as he alleges, he would have been willing to spend some of his own money on medication and/or counseling.  In October 2007, rather than taking his Trazodone as directed, plaintiff said he did not want to take it on the days when he was tired.  In January 2008, plaintiff was only taking 50 mg of Topamax a day rather than the higher dose he had been prescribed.  In March 2008 plaintiff stopped taking Luvox, which had helped with his rumination of thought, because it gave him erectile problems.

Very few if any of the instances of non-compliance are related to plaintiff having a mental impairment, as is suggested in plaintiff's brief.  While typically medication compliance is analyzed a bit differently in mental impairment cases, I find that plaintiff's impairment was almost never the reason for his non-compliance.

Finally, plaintiff argues that the observation of plaintiff's girl friend as reflected in the "Written Questions to Claimant (Adult)" should have been considered.  This argument is without merit.  There is no evidence that plaintiff's girl friend filled this form out or that the form contains observations of any third party as opposed to plaintiff's dictation.  Plaintiff even states in his brief that the form "appears" to "indicate" that a third person completed part of the form.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations of disability are not entirely credible.

## VIII.   PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in deriving a proper residual functional capacity. "[T]he ALJ erred when he rejected the medical opinions of Dr. Farrow and Dr. Bhargava, [plaintiff's] treating psychiatrists [sic].[16]  As such the ALJ failed to give the appropriate limitations when he formulated his RFC."  As discussed at length above, the ALJ appropriately discounted the opinions of those doctors.  I find that the ALJ's residual functional capacity assessment is properly based on all of the credible evidence in the record.

## IX.   CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge


Kansas City, Missouri
December 16, 2010

---

[16]Dr. Bhargava is a psychiatrist, but Dr. Farrow was a psychologist.